UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

- *v.* -

BRUCE MELVIN,
    a/k/a "BG,"

                Defendant.

23 Cr. 204 (PGG)

---

## THE GOVERNMENT'S SENTENCING MEMORANDUM

 

DANIELLE R. SASSOON
United States Attorney
Southern District of New York

Jacob R. Fiddelman
Michael R. Herman
Matthew J. King
Assistant United States Attorneys
   - *Of Counsel* -

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ................................................................................................... 1

I.     OFFENSE CONDUCT ................................................................................ 1

    A.   Overview .............................................................................................. 1

    B.   Melvin's Role in the Dub City Gang............................................................ 5

        1.   Shootings................................................................................... 5

        2.   Other Acts of Violence .................................................................. 10

        3.   Armed Robberies ........................................................................ 11

        4.   Drug Distribution ........................................................................ 12

        5.   Frauds ...................................................................................... 13

        6.   Firearms ................................................................................... 14

    C.   Melvin's Obstruction of Justice and Continued Criminal Conduct After His Arrest .. 14

        1.   Protective Order Violation............................................................... 15

        2.   Contraband Smuggling Scheme with other Mac Ballers ......................... 15

        3.   Frauds ...................................................................................... 20

        4.   Contraband Cellphone Smuggling..................................................... 20

        5.   Additional MDC Misconduct ........................................................... 20

II.    PROCEDURAL BACKGROUND AND SENTENCING GUIDELINES ...................... 21

DISCUSSION .................................................................................................... 23

I.     THE SENTENCING GUIDELINES ............................................................... 23

II.    A SENTENCE OF 360 MONTHS IS APPROPRIATE ...................................... 24

CONCLUSION................................................................................................... 29

## PRELIMINARY STATEMENT

*I'm Dub City Bro, that whole area my block bro.  Any n\*\*\*\* that's really Dub City that really put on for this shit gonna tell you the same thing I'm telling you brother. The whole area Walton that whole shit is ours brother.*

These are the words of defendant Bruce Melvin, the self-proclaimed violent enforcer for the Dub City gang, in an Instagram conversation with co-defendant Gabriel Valdez about the criminal activity Melvin does for the gang.  Melvin is a defendant who participated in multiple shootings—including those in broad daylight on Bronx streets—in furtherance of his gang.  He provided firearms to other Dub City members on multiple occasions.  He also engaged in drug trafficking and frauds with other members of Dub City, including account takeover and check washing schemes.

His crime spree did not even end when he was arrested in this case.  He has continued committing crimes for his gang from behind bars, violating the Court's protective order to punish a co-defendant for giving a post-arrest statement, obtaining contraband phones, smuggling and selling drugs and other contraband at the MDC, and attempted to continue frauds, contributing to prison disorder and exacerbating prison conditions about which he now complains.

If the Court were to consider just Melvin's pre-arrest offense conduct, a sentence in line with the 300-month aggregate sentence recommended by the U.S. Probation Office might be appropriate.  But given Melvin's brazen criminal and obstructive conduct post-arrest, a sentence of 360 months—still below Guidelines—is appropriate.

## BACKGROUND

### I.   Offense Conduct

#### A.    Overview

The Dub City Enterprise was a violent street gang, which was based out of the Mount Hope and Morris Heights areas in the Bronx, NY.  (PSR ¶ 38).  Dub City members refer to

1

themselves and their associates as "Dub City." (*Id.*). Members also indicate their membership through a specific Dub City hand sign, handshake, tattoos, and music videos, among other things. (*Id.*). Several members of Dub City—including Melvin—are also members of the Mac Ballers, a larger city-wide gang. (*Id.*)

Geographically, Dub City controlled the areas located within the vicinity of East 175 Street to East Burnside Avenue, between Jerome Avenue and Morris Avenue, in the Bronx, NY. (*Id.*). A map of Dub City's territory is included below:



Dub City gang members' main source of income was derived from robberies, fraudulent financial crimes, and the sale of controlled substances, including fentanyl, heroin, cocaine, oxycodone, and marijuana. (PSR ¶ 39). Members of Dub City, including the charged defendants in this matter, worked together to commit those crimes in furtherance of their membership in the gang. With respect to drug trafficking in particular, Dub City members prohibited non-gang

members from selling narcotics in their territory and enforced its control through violence and fear. (*Id.*).

In addition, Dub City members engaged in multiple fraudulent schemes, including bank fraud, identity theft, account takeovers, and check washing schemes. Dub City members facilitated these schemes by purchasing victims' personally identifying information, including social security numbers, copies of driver's licenses, and dates of birth. (PSR ¶ 40). Dub City members also fraudulently purchased victims' debit cards and credit cards as well as the PINs associated with the stolen cards. During the course of the investigation, agents discovered social media posts and photographs depicting stacks of cash, credit and bank cards in other people's names, blank and filled-in checks from various victims' bank accounts, and screenshots of check deposits made in other people's bank accounts. (*Id.*).

Members of Dub City sought to dominate completely their territory in the Bronx where they operated through fear, violence, and crime. In doing so, they regularly put the safety of that community at risk both in their violent rivalries with other gangs and through power struggles for dominance within Dub City. Indeed, Dub City gang members were often embroiled in violent rivalries with other street gangs that controlled adjacent territories, which resulted in numerous retaliatory shootings. Members of Dub City who committed violent acts against rival gang members were often rewarded with respect and status within Dub City. The violent acts committed by Dub City members were not always directed at rival gang members. Beginning in 2021, multiple Dub City members began vying for control of the gang, which resulted in infighting amongst gang members. Over the course of several months, multiple shootings and assaults occurred between members of Dub City as they vied for control of the gang. (PSR ¶ 41).

From at least 2019 through April 2023, the ten charged defendants in this matter—Bruce Silva, Bruce Melvin, Jordan Bennett, Elijah Pough, Shadell McBride, Justin Ballester, Alzubair Saleh, Giovanni Rodriguez, Gabriel Valdez, and Emmanuel Perez—were members and associates of the Dub City Gang, and participated in various criminal activities in connection with their membership within the gang, including shootings, robberies, assaults, and drug-trafficking.  (PSR ¶ 42).

All of the charged defendants, except for Saleh, appear together promoting the Dub City gang on music videos, which they propagate on the internet, including via YouTube.  In these music videos, the defendants, including Valdez, and other known members of Dub City promote Dub City, display Dub City hand signs and handshakes, use Dub City phrases, discuss Dub City's rivalry with other gangs, display firearms, express support for other members of Dub City who are incarcerated or deceased, and discuss in both general and specific terms criminal conduct committed by Dub City members.  Screenshots from some of these videos depicting Melvin, among others, are included below:



*(From L to R) Pough, McBride, Melvin, Ballester, and Rodriguez*

4



*Rodriguez, Melvin, and Perez*

**B.    Melvin's Role in the Dub City Gang**

Melvin, who went by the name "BG," participated in multiple shootings, provided firearms to other Dub City members on multiple occasions, engaged in drug trafficking, and frauds: in short, Melvin was heavily involved in all of the Dub City gang's criminal activities and is by far the most culpable defendant the Court has sentenced thus far.

**1.    Shootings**

Melvin committed multiple shootings in connection with his involvement in the Dub City gang.  A non-exhaustive list of his shootings are as follows:

<u>May 9, 2021 Shooting</u>

On May 9, 2021, at approximately 1 a.m., Melvin and Silva committed a shooting against rivals associated with the gang "D-Block" at the corner of Jerome Avenue and East 177th Street in the Bronx, inside Dub City territory. (PSR ¶ 86). The shooting was captured on surveillance video, which shows Silva, Melvin, and another Dub City member ("CC-1") driving together in a white Honda Accord in the vicinity of Jerome Avenue and East 177th Street. (PSR ¶ 86).

When the white Honda Accord arrived near a bar located on the corner of Jerome Avenue and East 177th Street, Melvin and CC-1 exited the vehicle followed by Silva. (PSR ¶ 87). Melvin

and CC-1 walked up to two males, believed to be associated with the rival gang, who were in front of the bar. (PSR ¶ 87). When CC-1 reached them, he pointed what appears to be a firearm at them. (PSR ¶ 87). In response to that, one of the males immediately jumped several feet backward towards the street, produced a firearm of his own, and pointed it in the direction of CC-1 and Melvin. (PSR ¶ 87). Melvin then took out his own firearm and fired multiple shots at that male while chasing him across Jerome Avenue. (PSR ¶ 87). After Melvin stopped pursuing the first target of his shooting, Melvin started to walk back across Jerome Avenue toward the bar and fired at least two more rounds at the second male, who was unarmed, and who was then standing on the corner opposite the bar. (PSR ¶ 88). Silva, who was five or six car lengths away from the shooting, took out a firearm of his own and fired it in the direction of the males. (PSR ¶ 88). Silva then got back into the white Honda Accord and drove away east on 177th Street. (PSR ¶ 88). Melvin and CC-1 fled in the same direction on foot. (PSR ¶ 88).

Evidence obtained from Melvin's Instagram account, pursuant to a search warrant, also confirms his involvement in the shooting as well as the fact that the shooting targeted members of "D-Block" (a rival gang). (PSR ¶ 89). Specifically, several hours after the shooting, Melvin exchanged messages with the target of the shooting and a member of "D-Block." (PSR ¶ 89). In those messages, the other individual told Melvin, among other things, "[y]ou seen me yesterday and became a track star" and "[y]ou aint really tryna [p]ut nobody down lmaooo." (PSR ¶ 89). Melvin responded by threatening the other individual and telling him, among other things, "[c]all what like it is you seen what went on last night," and, "Ima go first I'm not waiting to see what the vibes is," meaning Melvin would shoot the individual "first" on sight. (PSR ¶ 89).

In addition, four 9mm shell casings were found at the site of the shooting near where Melvin initially fired his weapon. (PSR ¶ 90). Those shell casings were a ballistics match for the

shell casings recovered from the scene of the June 2, 2021, shooting committed by Melvin and another individual, which is described in more detail immediately below. (PSR ¶ 90).

Screenshots of Melvin arriving at the scene of the May 9, 2021 shooting and then committing the shooting are included below, the one on the top right shows the muzzle flash from Melvin's gun.  Two video clips of the shooting are also attached as Exhibits A and B.

 



June 2, 2021 Shooting

On June 2, 2021, Melvin, along with a co-conspirator, were involved in a shootout with three other men including Dub City member Richard Barnwell[1] and another Dub City member. (PSR ¶ 91). The shooting took place at approximately 5 p.m. at a heavily trafficked intersection inside Dub City territory. (PSR ¶ 91). While driving a silver Subaru, Melvin approached Barnwell, who was walking on the street with a group of other individuals. (PSR ¶ 92). After a brief interaction, Barnwell ran away from the Subaru into the middle of a busy street, produced a firearm, and fired shots at Melvin's vehicle. (PSR ¶ 92). In response, Melvin's passenger leaned out of the window and used a firearm belonging to Melvin to return fire while Melvin drove southbound on Walton Avenue. (PSR ¶ 92).

A short time later, Melvin exited the Subaru (which at that time was marked by bullet holes) at a parking lot at 152 East 179th Street near Dub City territory.  (PSR ¶ 93). Evidence obtained from Melvin's Instagram account and cellphone from several months after the shooting, which was seized pursuant to search warrants, indicates that Melvin was in a dispute with Barnwell and the other Dub City member over the gang's narcotics-related activity. (PSR ¶ 93).

Two videos of the shooting are attached as Exhibits C and D, and a screenshot of Melvin's passenger shooting at Barnwell in broad daylight is included below.[2]

---

[1] For his participation in this same shooting, Barnwell was charged in indictment 21 Cr. 455 (MKV) with being a felon in possession of ammunition. Judge Mary Kay Vyskocil sentenced him to 84 months' imprisonment after he pled guilty.

[2] Melvin's passenger—the shooter—has not been identified.



<u>May 9, 2022 Shooting</u>

On May 9, 2022, at approximately 4:50 p.m., Melvin fired several rounds at an individual whom he believed was a member of the rival gang the "Mac 10s." (PSR ¶ 94). During the moments leading up to the shooting, Melvin, along with McBride were playing a dice game in front 2066 Morris Avenue, Bronx, NY, which is an area controlled by the "Mac 10" gang. (PSR ¶ 94). While leaving the game, Melvin was involved in a physical altercation. (PSR ¶ 94). Melvin then returned to Dub City territory to change his clothing before he returning to 2066 Jerome Avenue, where he fired multiple rounds at Mac 10s including Mac 10 gang member Nykeem Alston, who was standing in front of 2090 Morris Avenue. (PSR ¶ 94). After Melvin fired his weapon, Alston returned fire, striking an innocent bystander in the knee, who had to be receive treatment in the hospital.[3] (PSR ¶ 94).

---

[3] For his participation in this same shooting, Alston was charged in indictment 22 Cr. 517 (VSB) with being a felon in possession of ammunition. Judge Vernon S. Broderick sentenced him to 90 months' imprisonment, 40 months of which to run consecutive to a pending state court sentence, after he pled guilty.

Two videos of the shooting are included as Exhibits E and F, and two screenshots from the shooting are also included below. The image on the left shows Melvin before the shooting, and the image on the right shows Melvin during the shooting.

 

### 2. Other Acts of Violence

Melvin was also involved in multiple other acts of violence, none of which he disputes. For example, in or around the fall of 2021, Ballester informed a cooperating witness who at that time was also a Dub City gang member that Ballester and Melvin had gotten into an argument with a rival gang and that Dub City members "took care of it." (PSR ¶ 85). The cooperating witness separately learned that "took care of it" referred to an incident in which Melvin fired shots at the rival gang members. (PSR ¶ 85).

Melvin was also involved in the dispute that led to the October 14, 2021, shooting between Silva, Bennett, and another Dub City member ("CC-2"), (PSR ¶¶ 63, 119), which formed the basis for Counts Six and Seven (as to Silva), and Eight (as to Bennett) of the Indictment, and which is described in detail in the Government's sentencing submission as to Bennett. (Dkt. 180 at 4-5 and

Ex. A). Melvin provided CC-2 with the firearm that was the cause of this intra-Dub-City dispute. (PSR ¶ 119).

Also, in or about the fall of 2021, Silva disciplined Melvin by beating him with a broomstick in Dub City territory in connection with a dispute over Silva's leadership of the Dub City gang. (PSR ¶ 120). In retaliation, Melvin shot a gun within Dub City territory. (PSR ¶ 120).

### 3.  Armed Robberies

In October 2021, Melvin and Ballester, robbed another drug dealer of marijuana at gunpoint. (PSR ¶ 95).

Melvin also was involved in other robberies and conspiracies to commit other robberies. For example:

- Evidence obtained from Melvin's cellphone, as well as Silva's cellphone, show that Melvin worked with Silva and Bennett to plan an armed robbery of another individual in or about July 2021. (PSR ¶ 96). During this conversation, Silva and Melvin discussed the potential target and whether he was armed. (PSR ¶ 96). Silva told Melvin that he was with Bennett at the time. (PSR ¶ 96). Throughout the conversation, Silva directed Melvin on what do. (PSR ¶ 96). For his part, Melvin appeared to be surveilling the intended victim and discussing the fact that he and Bennett had firearms of their own. (PSR ¶ 96). At one point, Melvin asked Silva whether he wanted Melvin and Bennett to just "hop out" and commit the robbery because they had two firearms. (PSR ¶ 96). Silva told Melvin to "wait for the right moment" and confirmed that Melvin and Bennett had two firearms with them. (PSR ¶ 96). The Government is unaware as to whether this robbery was completed.

- Between March 16, 2022, and March 27, 2022, Melvin exchanged several text messages with an individual known as "Gleechie" concerning other potential robberies. (PSR ¶ 97). On several occasions, "Gleechie" told Melvin about a new potential target and asked Melvin if he had access to a car. (PSR ¶ 97). On one of those occasions—on March 16, 2022—"Gleechie" characterized one of the robbery targets as an "opp"— which is a reference to rival gang members. (PSR ¶ 97).

- On Rodriguez's Instagram, Rodriguez and Valdez discussed a plan that Melvin came up with to rob one of Melvin's own friends. (PSR ¶ 98). Valdez and Rodriguez discussed how the robbery target—Melvin's friend—would never expect being robbed by Melvin and how Melvin was dangerous. (PSR ¶ 98).

### 4.  Drug Distribution

Melvin also has engaged in drug trafficking with other members of Dub City. (PSR ¶ 99).

Melvin worked with and for Bennett to distribute marijuana and collect proceeds from the sale of marijuana. (PSR ¶ 99). On Melvin's cellphone, there is a conversation between Melvin and Bennett where, over the course of several months, the two discussed Bennett's marijuana business. (PSR ¶ 100). For example, on one occasion on or about September 14, 2021, Melvin asked Bennett how much marijuana Bennett gave to Emmanuel Perez. (PSR ¶ 101). On another occasion, on or about May 24, 2022, Bennett reprimanded Melvin for taking too long to move a quarter pound of marijuana. (PSR ¶ 102). Melvin's cellphone also contains conversations between Melvin and Perez concerning their work for Bennett. (PSR ¶ 103). During that conversation, Melvin and Perez frequently discussed the day-to-day workings of the marijuana business, including how to split drug proceeds, how much buyers were charged, and whether Bennett was paid for the marijuana, among other things. (PSR ¶ 103).

Evidence from Melvin's cellphone also establishes that Melvin worked together with Ballester and Rodriguez to sell marijuana for Dub City. For example, in or about September 2021, Ballester told Melvin, that he was going to help Melvin sell marijuana on his "block" because Melvin was taking too long to do it. (PSR ¶ 104). Similarly, in or about September 2022, Rodriguez told Melvin, that he had marijuana waiting for Melvin and that he wanted to make money with Melvin and be productive "as a team." (PSR ¶ 105).

Around the same time that the cellphone evidence establishes Melvin's involvement in drug distribution for Dub City, law enforcement officers arrested Melvin in a car in Dub City territory with marijuana that was packaged for sale. (PSR ¶ 106). More specifically, on October 13, 2022, Melvin posted an Instagram "story" advertising marijuana sales. (PSR ¶ 106). An NYPD

12

officer then observed Melvin in person in Dub City territory wearing an outfit that included the same sneakers and pants that can be seen in one of Melvin's Instagram stories advertising the marijuana sales. (PSR ¶ 106). After a short period of time, the same law enforcement officer observed Melvin enter the passenger seat of a gray Honda Accord. (PSR ¶ 106). While Melvin was still in the vehicle, Melvin posted again on Instagram showing himself holding what appeared to be three zip lock bags containing marijuana and advertising a sale price. (PSR ¶ 106). The video appeared to be taken inside the gray Honda, indicating that Melvin had marijuana inside the vehicle that he intended to sell. (PSR ¶ 106). Based on that information, the officers approached the gray Honda, placed Melvin and another individual who was in the vehicle under arrest, and seized packaged marijuana, a digital scale, and other items consistent with marijuana trafficking from inside of the vehicle. (*See* PSR ¶ 106).

### 5. Frauds

Melvin also engaged in a substantial amount of fraud with other members of Dub City, including account takeover and check washing schemes. (PSR ¶ 107). For example, evidence obtained from Melvin's Instagram account and cellphone establish the following, among other things:

- Melvin worked together with Bennett on a check washing scheme. (PSR ¶ 108). Between September 3, 2022, and September 13, 2022, Melvin exchanged text messages with Bennett concerning their depositing fraudulent checks into a new Wells Fargo account that Melvin acquired from another person. (PSR ¶ 108).

- In or about 2020 and 2021, Melvin also exchanged messages on Instagram with several other people, including another Dub City member, in which he discussed the availability of Bank of America and Chase bank accounts for use in fraud. (PSR ¶ 109). In one of those conversations, Melvin referenced the fact that Bennett had access to Chase accounts. (PSR ¶ 109).

- In addition, on Melvin's cellphone, there are conversations between Melvin and other individuals concerning his commission of fraud. (*See* PSR ¶¶ 110, 111). On one occasion, in or about February 2022, an unknown individual named "VRoy"

told Melvin that he had a bank account that had been open for two months in which $4,200 had already been deposited fraudulently. (PSR ¶ 111). Melvin responded by saying, that they would use that account and see what happens. (PSR ¶ 111). On another occasion, in or about January 2022, Melvin communicated with someone called "Sha Karter," concerning Melvin's use of that person's bank account. (PSR ¶ 110). Melvin told "Karter," that he could use checks to deposit money in the account but that he also knew a way to do it without using checks. (PSR ¶ 110). Melvin also told "Karter" that he would take fifty-percent of whatever money he cleared in the account. (PSR ¶ 110).

### 6. Firearms

Throughout his involvement in Dub City, Melvin also was a source of firearms for other members of Dub City. (PSR ¶ 112). For example, evidence obtained from Melvin's cellphone and Instagram account establish the following, among other things:

- In February 2021, Melvin asked Valdez to take a gun to McBride for him.

- In February 2022, Bennett told Melvin that he needed a firearm.

- In March and April 2022, Melvin told Perez to take his firearm—a particular Dub City firearm Melvin called "Jennifer" or "Jenny".[4]

- In September 2022, Melvin told Perez that he has to pay Melvin back with either money or a firearm for losing one of Melvin's firearms.  Specifically, on September 24, 2022, Melvin texted Perez "We not gonna keep going on everyday knowing u gave my shit away u gotta Pass Donny [a reference to money] or A Knew Tay Mu [another Dub City nickname for a firearm] nobody told you pass my shit without permission."  Perez responded, "… I know what I did you don't have to keep reminding me as if I'm not a man owning up to my faults."

(*Id.*).

### C.  Melvin's Obstruction of Justice and Continued Criminal Conduct After His Arrest

Since his arrest and detention at the Metropolitan Detention Center ("MDC"), Melvin has obtained access to multiple contraband phones through which he has continued to commit crimes,

---

[4] Melvin released a rap song called "Jennifer" in which he raps that he "calls my heater Jennifer". See: https://www.youtube.com/watch?v=u1MBWFGlsb4.

continue the affairs of the charged racketeering enterprise, and violate the protective order entered by the Court.  (PSR ¶ 113; *see also* Dkt. 163 (Court finding, after a hearing, that Melvin violated the protective order by broadcasting a recording of co-defendant Jordan Bennett's post arrest interview via a contraband phone).  In his sentencing submission, Melvin has not disputed any of this conduct, except to maintain his denial of his involvement in the protective order violation. But the Court already ruled that the Melvin committed that violation.  Dkt. 163.

### 1.  Protective Order Violation

As the Court is aware, the most egregious post-arrest conduct involved Melvin posting a video of him using a contraband phone to record an audio-recorded post-arrest statement of co-defendant Bennett on the Instagram live page of "Code 33," which is an Instagram handle that exists for the purposes of spreading leaked information and rumors about who is and who is not cooperating in criminal cases.  (PSR ¶ 114).  A recording of Melvin's contraband phone was then rebroadcast on You Tube.  Shortly thereafter, Bennett was attacked at the MDC, and he was thereafter stabbed at another prison facility resulting in him receiving treatment at a hospital.  (*Id.*)

### 2.  Contraband Smuggling Scheme with other Mac Ballers

Melvin's post-arrest misconduct also included using a contraband phone to be a member of a group chat on Telegram, an encrypted messaging application, called "Real Right Ballas [bee emoji]" which is the Mac Baller set with which Melvin and many other Dub City members are affiliated.  (PSR ¶ 113).  While Melvin did not appear to send any texts in this group chat, it nevertheless shows his continued affiliation with that gang.  Indeed, as the Court is aware from co-defendant Ballester's sentencing, Melvin also appeared in an Instagram photo posted to the Intagram page "600maybachh"[5] on or about July 3, 2024 depicts a number of inmates posing

---

[5] Both "600" and "Maybach" are known references to the Mac Baller gang.

together, including Melvin (tagged with his Instagram handle "pop_champagne__"), and co-defendants Ballester ("moneybaggunz"), and Bruce Silva ("blanc_way"). The caption on the post includes the tag "#RRB," a reference to the "Real Rite Ballers" subset of the Mac Ballers gang with which many Dub City gang members are associated, and an image of a bumblebee, a known image frequently used by Mac Baller gang members to refer to the gang:



And Melvin's contraband phones are filled with references to Mac Ballers, including Melvin spouting Mac Baller terminology in connection with apparent contraband smuggling. For example, on or about June 23, 2024, Melvin, on his contraband phone, engaged in the following conversation with a user saved as "Bbagz" in Melvin's phone, apparently another MDC inmate:

Bbagz:       Send me something to smoke in the morning
             Whatever you send I'ma send back and more on Monday
             I got da load coming
             

Melvin:      Kopy saydat I gotchu

16

[…]

Bbagz:          Send ya app

[…]

Melvin:         [sends a CashApp username]

[…]

Bbagz           I'ma hit ya jack [i.e., Melvin's contraband cellphone] in da morning when
                n[*****]z pop out. I'ma have PO get next to Blanc [co-defendant Bruce
                Silva] or whoever doing chow

[…]

Melvin:         Kopy saydat bro DoubleRB

                Yoo wok

Bbagz:          Ayo dat shit was a TD Brudda. You know we appreciate you BabyBro &
                you already know da vibes 👌TMB🦋

Melvin:         Saydat RRB

In the above chat, Melvin agrees to provide another inmate with "something to smoke in

the morning" (i.e., prison contraband) for money, while working with co-defendant Bruce Silva,

referred to by one of his nicknames "Blanc."  Melvin follows up on that transaction by referencing

Mac Baller terminology including "wok" (short for "ewok," a Mac Baller exclamation) and "RRB"

(for Real Rite Ballers).

Melvin's contraband phones contain substantial evidence (including photos of drugs) of

him smuggling in narcotics including marijuana into the MDC, including working with other Mac

Baller inmates to do so.  (PSR ¶ 116).  And Melvin advertised marijuana and cigarettes to other

inmates who were also using contraband phones, including one instance described above.  (Id.).

In addition, Melvin had the following exchange on his contraband phone using Telegram, the encrypted messaging application, with a user named "Donjuan 2":

Melvin:       

Donjuan 2:    Top of the Maybach [Mac Baller terminology]
              What you end up doing ?

Melvin:       I pushed the don [i.e., made money]

In other chats, Melvin attempts to sell cigarettes to other inmates using his contraband phone, including sending the following photograph of bunches of cigarettes hidden in what appears to be an ordering list from MDC commissary:



Melvin also utilized other Dub City members in furtherance of his smuggling activities. For example, on February 23, 2024, Melvin engaged in the following text message exchange on Melvin's contraband phone with another inmate who was using a contraband phone with phone number ending in -8941:

> -8941: Smh [shaking my head] / N**** PO came and brought smash [believed to be another inmate] something and aint let u give him ya shit
>
> Melvin: Tell wolf [co-defendant Valdez] call me when he get it [/] Tell boy slide I'm on the door
>
> -8941: I sent that n**** out there already ya wasn't onda door
>
> Melvin: Tell wolf [Valdez] its quite [i.e., quiet] till later

In the above exchange, Melvin appears to be telling another inmate to have Valdez ("wolf") to call him when he gets contraband and to pass it to him when it is quiet, i.e., when guards aren't watching.

19

### 3.  Frauds

Melvin also used contraband phones to attempt to engage in fraud schemes.  (PSR ¶ 115).

For example, in June 2024, Melvin used Telegram to exchange messages with an individual known

as "Twin" about a fraud scheme. (*Id.*). Twin asked whether Melvin had "stimi" (which is used to

mean federal stimulus checks or simply checks from the federal government) and then sent Melvin

photographs of multiple U.S. treasury checks as well as another photo of a large stack of hundred

dollar bills and a phone showing a $14,557.33 balance at Bank of America.  Melvin responded,

"Yea but u got bigger balances?" to which Twin said, "Yeah," and Melvin said, "Aight bet how

much u sell em for?"  Twin responded "Let's collab" (i.e., work together in the fraud scheme), and

Melvin wrote, "Ima put the play together . . . Aight I got a lil inny hold on" and then the two

engaged in a video chat for one minute and 17 seconds.  (*Id.*).

### 4.  Contraband Cellphone Smuggling

Melvin further engaged in communications via WhatsApp, another encrypted messaging

application, about smuggling contraband phones into the MDC.  (PSR ¶ 117).  For example, in

June 2024, another co-conspirator send Melvin photographs of three iPhones.  Melvin asked "How

much" and the co-conspirator said "Iphone 55 samsung 4k" and Melvin responded "Bro those

numbers is crazy then I still gotta pay for it to get here."  These messages—along with Melvin's

own possession of contraband phones—strongly support the inference that he was involved in

smuggling contraband cellphones in the MDC.

### 5.  Additional MDC Misconduct

As indicated in the Presentence Report, Melvin has incurred multiple disciplinary violations and

committed multiple infractions.  (PSR ¶ 36).  The Presentence Report notes one infraction for

obtaining drugs and alcohol (suggestive of contraband smuggling) on June 25, 2024 (near in time

to some of the text message communications noted above) and for possessing a hazardous tool, another incident on September 12, 2023, when he was again sanctioned, this time for fighting. (*Id.*). In addition to those referenced in the Presentence Report, the Government obtained incident reports from the MDC indicating more recent prison misconduct. Specifically, on November 19, 2024, Melvin was sanctioned for threatening, being insolent to, and cursing out MDC staff. In short, despite his incarceration, Melvin is far from rehabilitated.

## II.    **Procedural Background and Sentencing Guidelines**

On April 18, 2023, the Grand Jury returned 20-count indictment 23 Cr. 204 (PGG), charging the ten defendants described above. On August 29, 2024, Melvin pleaded guilty to racketeering conspiracy, in violation of 18 U.S.C. § 1962(d) (Count One), two counts of the lesser included offense of brandishing a firearm during and in relation to a crime of violence, both in violation of 18 U.S.C. § 924(c)(1)(A)(i),(ii) and 2 (Counts Five and Twelve), pursuant to a written plea agreement with the Government (the "Plea Agreement").

In the Plea Agreement, the parties agreed to the following calculation pursuant to the United States Sentencing Guidelines (the "Guidelines"). Group One reflected Melvin's participation in the May 9, 2022 attempted murder and carried an adjusted offense level of 35 because the underlying offense constituted attempted murder in the first degree and a two-level increase applied because the victim sustained serious bodily injury. Group Two reflected Melvin's participation in the June 2, 2021 attempted murder and carried an adjusted offense level of 27 because the underlying offense constituted attempted murder in the second degree. Group Three reflected Melvin's participation in the May 9, 2021 attempted murder and carried an adjusted offense level of 27 because the offense constituted attempted murder in the second degree. Group Four reflected Melvin's participation in armed robberies, which carried an adjusted offense level of 26 because the object of at least some of the robberies involved stealing controlled substances

and because a firearm was brandished or possessed for at least some of the robberies. Group Five reflected Melvin's participation in the broader racketeering conspiracy's bank fraud and reflected an adjusted offense level of 25 after various enhancements. Group Six reflected Melvin's participation in the gang's drug trafficking activity in distributing marijuana and Percocet. Because these drugs carry a comparatively low conversion rate, and the Government lacked sufficient data regarding the total quantity of drugs involved, the parties recognized that this group would end up being nine or more levels lower than the group with the highest offense level and would not contribute to the grouping analysis. Indeed, Groups Four, five, and Six are all nine or more levels lower than the group with the highest offense level. After a grouping analysis, a two level increase for Melvin's obstruction in violating the protective order, as described above, and the resulting denial of acceptance of responsibility points, the parties stipulated that Melvin's total offense level was 39 for Count One. The parties further stipulated that Melvin's convictions for the lesser included offenses for Counts Five and Twelve are the minimum term of imprisonment authorized by statute, which is 84 months' imprisonment for each count, which must be imposed consecutively to any other sentence imposed.

The parties further stipulated that Melvin has no criminal history points and is therefore in Criminal History Category I, resulting in a stipulated Guidelines sentence of 240 months' imprisonment for Count One (pursuant to U.S.S.G. § 5G1.1(c), with mandatory consecutive terms of 84 months' imprisonment for each of Counts Five and Twelve, for a total stipulated Guidelines sentence of 408 months' imprisonment.

The Probation Office agrees with the parties as to the ultimate applicable Guidelines range, although it applied a slightly different analysis and a different criminal history category. (PSR ¶¶ 152-198).[6]

## DISCUSSION

### I.    The Sentencing Guidelines

The Sentencing Guidelines still provide important guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby,* 397 F.3d 103 (2d Cir. 2005). Indeed, although *Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. *Booker*, 543 U.S. at 264. As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

---

[6] Specifically, the Probation Office used a base offense level of six, rather than seven, for the bank fraud group, resulting in adjusted offense level for that group of 24, rather than 25. (*See* PSR ¶ 186). This difference does not affect the overall offense level calculation because of the effect of the grouping analysis. The Government believes that the Probation Office's calculation of the offense level applicable to the bank fraud group may be correct, though the Court need not address the matter because it has no impact on the ultimate range.  Similarly, the Probation Office added an additional Guidelines group for the November 2021 attempted murder, which also does not affect the ultimately Guidelines sentence and, therefore, the Court need not address whether this additional group is appropriate.  (PSR ¶¶ 172-175).  Lastly, the Probation Office noted a prior conviction resulting in a youthful offender adjudication, as to which the Government was unaware, but which also does not affect the Guidelines calculation.  (PSR ¶ 198). *See United States v. Borrego*, 388 F.3d 66, 70 (2d Cir. 2004) (A "court is not obliged to waste its time making [Guidelines] findings that would have no effect on the sentence."); *United States v. Tracy*, 12 F.3d 1186, 1203 (2d Cir. 1993) (when a sentencing dispute has no bearing on the determination of a sentence, courts need not rule on disputed offense level adjustments).

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(1)-(7). *See also Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)    to afford adequate deterrence to criminal conduct;

(C)    to protect the public from further crimes of the defendant; and

(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

## II.    A Sentence of 360 Months Is Appropriate

A sentence of 360 months' imprisonment is sufficient but not greater than necessary, considering (i) the serious nature of the instant offense and the need to promote respect for the law, (ii) the need for general deterrence, and (iii) the need to protect the public and to afford adequate deterrence of future criminal conduct. Such a sentence appropriately balances the Section 3553(a) factors including by accounting for Melvin's complete disregard for the safety and wellbeing of his community and the substantial criminal conduct that Melvin has continued to engage in while incarcerated at the MDC. The Government does not make this recommendation lightly. But Melvin is an extraordinarily violent criminal who, alongside Brue Silva, is one of the two most dangerous

members of Dub City charged in this case. He criminal conduct—past and continuing—shows his indifference to the damage that his conduct has caused, and the Mount Hope and Morris Heights areas in the Bronx are not safe if Melvin is released as a young man. His actions demand a sentence that will incapacitate him for a substantial period of time.

*First*, a substantial term of incarceration is necessary to reflect the seriousness of the defendant's conduct and to promote respect for the law. As discussed above, Melvin engaged in wide-ranging criminal conduct as a member of Dub City. He participated in multiple shootings, some of which occurred in broad daylight on Bronx streets. He committed at least one armed robbery and plotted several more. He distributed drugs. He committed fraud. He armed other members of Dub City. He breached the protective order in this case and, as a result, made his co-defendant Bennett a permanent target for violent reprisal. He continued to sell drugs, engage in fraud, and deal contraband inside the walls of MDC. He is, unequivocally, a threat to society whose commitment to crime, including violent crime, has been unwavering since at least 2019.

The perniciousness of Melvin's criminal conduct is clear from examining just two of the many crimes Melvin has committed as part of this case. The first is the May 9, 2022 shooting. That was a daytime shooting in a busy area of the Bronx. Melvin got into a physical fight with rival gang members earlier in the day, and rather than leave it at that, Melvin left the area, changed his clothes, returned to the area with a firearm, and initiated a gun battle with several members of that same rival gang. That shooting resulted in an innocent bystander being injured by a bullet but very easily could have had irreversibly worse consequences. This incident shows, quite clearly, that Melvin has no regard for the wellbeing of his community and is willing to risk causing death in order to settle a petty, personal score.

The second incident is Melvin's posting to the internet—in particular, the Instagram live page of a group that exists almost exclusively to persecute cooperating witnesses—the post-arrest statement of his co-defendant Bennett, whom Melvin incorrectly believed to be a cooperating witness. Melvin's act was in direct contravention of an order from this Court and illustrates his complete lack of respect for the law.  It also led to Bennett being attacked at MDC and then stabbed at another prison facility. Yet again, Melvin put himself above all others (including this Court) in a manner that put lives at risk, all for the sake of promoting himself and his gang.

The dangerousness and relentlessness of Melvin's criminal conduct, stands out among his co-defendants and demands a very significant sentence.

*Second*, a very significant sentence is needed to promote general deterrence among current and would be gang members and other defendants at MDC.  The defendant's conduct over a long period of time contributed to the scourge of gang-related criminality and gun-related violence that is currently plaguing New York City. Indeed, multiple large-scale studies show the deleterious effect on our community of gang members and their resulting criminality.  For example, as the Government has discussed in its submission in connection with Jordan Bennett's sentencing, the FBI's 2011 National Gang Threat Assessment cites a NGIC (National Gang Intelligence Center) study that finds gangs are responsible for an average of 48% of violent crime in most jurisdictions, and up to 90% in some areas. Major cities and suburban areas experience the highest levels of gang-related violence. Similarly, the National Gang Center survey analysis shows that intergang conflict and drug-related activities (all of which Melvin is responsible for) are the primary drivers of local gang violence. A substantial sentence of imprisonment, therefore, is necessary to afford adequate deterrence of criminal conduct of this type.

In addition, Melvin's continued criminal conduct inside MDC is contributing directly to prison disorder and exacerbating prison conditions about which he and other defendants now complain. A significant prison sentence is also needed to show incarcerated defendants who are, or might be considering, engaging in similar conduct that the Court takes continued criminal conduct while in pretrial detention extremely seriously and that such conduct is an aggravating factor that will increase a defendant's prison sentence.

*Third*, Melvin's criminal conduct underscores the need for a sentence that protects the public from, and specifically deters, Melvin. Whether promoting gang violence, selling marijuana, committing fraud, arming compatriots, shooting at rivals, committing armed robbery, disregarding court orders, or selling contraband in prison, Melvin has proven himself a grave danger to the public. While the defendant is a young man, he has demonstrated a complete disregard for the public and the victims of his crimes for several years.  He has also demonstrated a steadfast commitment to criminal conduct and an unwillingness to change his behavior, even after being charged in this case.  There is nothing in the record at sentencing that supports Melvin's statement to this Court that he is willing to work hard to reintegrate into society. Quite the opposite. All the evidence before the Court shows that Melvin will not reform his ways absent a substantial prison sentence.

The Court should reject Melvin's arguments for a significant downward variance to below 360 months' imprisonment.

Melvin's primary argument for leniency is directed at the prison conditions at the MDC. (Dkt. 289 at 22-26).  While the Court can and should take these circumstances into account in fashioning an appropriate sentence, MDC conditions cannot justify a significant variance from the applicable Guidelines sentence.  And while a number of courts in this District have previously

found that the conditions at MDC were in need of significant improvement, the MDC has over recent months taken serious steps to address those issues and has steadily improved conditions, increasing staffing levels and addressing persistent medical issues.  As Judge Caproni noted just several weeks ago, "MDC is improving every day."  (24 MJ 4261 (UA) (VEC), Dec. 10, 2024 Tr. 15.)[7]  Moreover, while Melvin complains about frequent "lockdowns," among other issues, he was not incarcerated at the MDC in 2020, 2021, or 2022, at the height of the COVID-19 pandemic where there were more frequent lockdowns.  And even when defendants were incarcerated at the height of the pandemic, courts found that the conditions at the MDC did not warrant "significant Guidelines departure[s]" requested by defendants.  *See United States v. Stewart*, No. 21 Cr. 42 (WFK), 2023 WL 2599668, at *7 (E.D.N.Y. Mar. 22, 2023); *see also, e.g.*, *United States v. Sanchez*, No. 01 Cr. 74-2 (PAC), 2022 WL 4298694, at *2 (S.D.N.Y. Sept. 19, 2022) (finding, in context of compassionate release motion, that "the difficult—but generalized—prison conditions during the COVID-19 pandemic" do not constitute extraordinary and compelling circumstances for a defendant's release); *United States v. Boynton*, No. 20 Cr. 43 (RPK), 2022 WL 7131927, at *1 (E.D.N.Y. Oct. 12, 2022) (collecting cases to same effect).

In addition, Melvin's claim that "it is the *certainty* of punishment, rather than its *severity* that is the most effective deterrent" (Dkt. 289 at 27) is simply incorrect, especially for violent crime.  Indeed, the United States Sentencing Commission has observed that longer sentences do,

---

[7] Even more recently Judge Caproni commented just last week that "The horror stories from a year ago [at the MDC], it's not the same facility." (quoted in Molly Crane-Newman, NYC judge rejects massive bond offer by millionaire Alexander brothers accused of sex trafficking, https://www.nydailynews.com/2025/01/15/nyc-judge-rejects-massive-bond-offer-by-millionaire-alexander-brothers-accused-of-sex-trafficking/).

in fact, reduce recidivism (29% lower for sentences greater than 10 years). United States Sentencing Commission, "Length of Incarceration and Recidivism" at 19 (June 2022).[8]

In short, none of Melvin's arguments either individually or collectively warrant the substantial variance he seeks. Rather, for all the reasons indicated above, , a sentence of 360 months is necessary to grant the public a reprieve from Melvin's dangerous conduct, deter him from future criminal activity, and, with hope, help dismantle the violent Dub City gang.

## CONCLUSION

Bruce Melvin was a violent enforcer for a violent street gang, shooting at rivals and fellow gang members multiple times with impunity until he was arrested. Undeterred, he continued his criminal conduct while in jail. He also obstructed justice. There is an intense need to deter Melvin and other violent gang members like him in this city and to set a message that other young men should resist the pull of street gang participation. A significant, though below-Guidelines, sentence of 360 months is warranted.

Dated: New York, New York
          January 23, 2025

                                        Respectfully submitted,

                                        DANIELLE R. SASSOON
                                        United States Attorney

                          By:  _____/s/_____
                                        Jacob R. Fiddelman
                                        Michael R. Herman
                                        Matthew J. King
                                        Assistant United States Attorneys
                                        (212) 637-2190 / -2221

---

[8] Available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2022/20220621_Recidivsm-SentLength.pdf